# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

OPENRISK, LLC,

                Plaintiff,

v.

MICROSTRATEGY SERVICES
CORPORATION,

                Defendant.

Case No. 1:15CV1451
AJT\TCB

## COMPLAINT

### INTRODUCTION

1.    Founded in January 2011, OpenRisk was a promising start-up company developing a software platform to be used by insurance and reinsurance companies to estimate damage to real property portfolios caused by natural catastrophes, including hurricanes, floods and earthquakes (the "Platform"). The key innovation of the OpenRisk Platform was making these catastrophe – or "CAT" – models and other related hosted data available to its customers via an internet-based "private cloud," enabling for the first time web-based access to catastrophe models using a common interface, while ensuring data security and unprecedented speed. The principal value proposition of the OpenRisk Platform was eliminating or reducing customers' need to maintain their own massive hardware systems, high-end modeling specialists and technological support – promising major cost savings. The OpenRisk offering also enabled catastrophe models to run 40 to 80 times faster than usual, which in turn enabled faster projections of damage from major catastrophes.

2.    Leaders in the technology and insurance industries and major investors took notice of OpenRisk.

3.     In June 2011, OpenRisk continued to develop its Platform, including through a contract it had with IBM whereby IBM made an in-kind contribution to OpenRisk of software development estimated by OpenRisk to be worth approximately $1 million. The contract was initially entered into in November 2010 between LockeBridge, Inc. and Netezza, Inc., which was acquired by IBM. LockeBridge, Inc. is a company owned and operated by Scott Waxler, a shareholder of OpenRisk. The contract was assigned to OpenRisk in 2011.

4.     In June 2011, IBM awarded OpenRisk its Top Analytic Inventor Award. By September 2011, OpenRisk had a sales pipeline of more than $9 million in prospective contracts. Also, OpenRisk was in contract negotiations with AIG/Chartis Insurance for a joint product development project, and billion-dollar global reinsurance intermediary Guy Carpenter & Company, LLC had expressed interest in being OpenRisk's exclusive customer among reinsurers.

5.     Also by September 2011, the architecture and related components for the OpenRisk Platform were sufficiently developed to build the cloud environment. This was a necessary next step towards bringing its product to market. MicroStrategy, a technology company in Northern Virginia, had just begun to provide cloud services and was in search of customers for its new services. OpenRisk – with its promising product in development and many interested investors and prospective customers – was exactly the kind of customer that MicroStrategy wanted.

6.     At the end of September 2011, after several meetings between OpenRisk and MicroStrategy – including a dinner meeting in New York with MicroStrategy's CEO Michael Saylor and OpenRisk's CEO James Aylward – OpenRisk and MicroStrategy entered into a contract under which, in exchange for fees, MicroStrategy would provide two terabytes of data

2

storage for the OpenRisk Platform and set up a cloud environment for OpenRisk pursuant to the parameters set forth in confidential, proprietary OpenRisk architecture which OpenRisk shared with MicroStrategy (the "Cloud Contract"). The Cloud Contract had a term of five years but permitted MicroStrategy to terminate the Cloud Contract for OpenRisk's failure to pay fees.

7.      MicroStrategy, including employees up to and including its CEO Michael Saylor, viewed the Cloud Contract as "a great win and a strategic win" for the company and its new cloud business: its "first cloud transaction in the Northeast Region/New York Metro with substantial growth potential." In fact, the OpenRisk Cloud Contract was among the first five cloud deals for MicroStrategy company-wide and it was many times larger than these other deals---it was the first cloud deal for MicroStrategy which exceeded $1 million dollars in aggregate revenue. For this, MicroStrategy awarded the account manager on the Cloud Contract, Jordan Christopher, an advance commission of $51,600. It awarded three other executives on the sales team approximately $17,200 each in advance commissions on the OpenRisk Cloud Contract. And it awarded another approximately $31,500 in commissions to numerous other MicroStrategy employees in connection with the OpenRisk Cloud Contract, including Brian Reitenauer and Rafael Blotta who had supervisory responsibilities over Mr. Christopher.      MicroStrategy could claw back Christopher's and the other employees' commissions - totaling $134,734.20 - if the Cloud Contract and its revenues stopped. Thus, MicroStrategy incentivized Christopher and the other employees to hold onto the Cloud Contract and its revenues.

8.      Meanwhile, in August 2011, OpenRisk was introduced to Marc Roston, a principal with the investment capital firm MNR Capital, LLC ("MNR Capital"), as a possible

3

investor. Roston offered $200,000 for a controlling interest in OpenRisk. Because this implied an enterprise valuation of merely $400,000 and the actual valuation was many times that, OpenRisk refused Roston's offer.

9.     Roston would not take no for an answer. If he could not have a controlling interest in OpenRisk, he still wanted to have a controlling interest in its valuable intellectual property and promising business prospects so that he could profit from them. Unbeknownst to OpenRisk, Roston resorted to unlawful means to get what he wanted. He secretly sought out key officers, members and employees of OpenRisk – including OpenRisk's President, Craig Ott; its Chief Technology Officer and Executive Vice President, Shajy Mathai; and its Chief Scientist and Senior Vice President, Richard Murnane, (collectively, the "Former Officers") – and conspired with them so that they would leave OpenRisk together in order to force OpenRisk's founders to accept Roston's offer. OpenRisk still would not accept his offer.

10.    Roston and the Former Officers also conspired to steal OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets, along with its business prospects, even though the Former Officers all owe contractual and fiduciary duties to OpenRisk to maintain the secrecy and confidentiality of the information and not to usurp OpenRisk's corporate opportunities. Roston and others formed a new company called Spectant Group, LLC ("Spectant") for this purpose.

11.    MicroStrategy joined the conspiracy to steal OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets, along with its business prospects, even though MicroStrategy knew that its Former Officers and agents owed express or implied contractual and fiduciary duties to OpenRisk and that these duties were being violated in the commission of the conspiracy. MicroStrategy

4

embezzled the data that OpenRisk stored in its cloud environment – an environment entrusted to, hosted by and setup by MicroStrategy based upon OpenRisk's proprietary architectural drawings. MicroStrategy facilitated the Co-conspirators' (which included Marc Roston and his companies MNR Capital, Spectant and Arcvandam; the three Former Officers Craig Ott, Shajy Mathai and Richard Murnane; as well as Nitish Mathew and Dileep Shiva) larceny of OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets. MicroStrategy did this by giving the Co-conspirators unauthorized access to OpenRisk's cloud environment, on which OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets was transferred and stored, and then concealing from OpenRisk that it had given the access; by secretly accepting payments from the Co-conspirators and concealing those payments from OpenRisk; and by secretly working with the Co-conspirators to pick up the development on the OpenRisk Platform where OpenRisk left off fully knowing that its Former Officers resigned in concert to secretly join Roston and his new company Spectant.

12. MicroStrategy acted willfully and maliciously in furtherance of the conspiracy against OpenRisk. MicroStrategy not only concealed from OpenRisk that it had facilitated the larceny of OpenRisk's intellectual property and business information, it misled OpenRisk by demanding that OpenRisk pay fees for services under the Cloud Contract even though the Co-conspirators had paid those fees and had been given unauthorized access to OpenRisk's cloud environment and even though MicroStrategy had intentionally deleted the OpenRisk cloud environment and its contents after MicroStrategy and/or the Co-conspirators had duplicated and transferred it to Spectant's cloud environment hosted by MicroStrategy. MicroStrategy then terminated the Cloud Contract for non-payment.

13. As a result of MicroStrategy's participation in the conspiracy and other unlawful acts, MicroStrategy and its Co-conspirators have harmed and continue to harm OpenRisk.

## PROCEDURAL HISTORY

14. OpenRisk first learned of MicroStrategy's role in the conspiracy through discovery in litigation that OpenRisk filed against the Former Officers in state court in Massachusetts. OpenRisk then sued MicroStrategy in that court in June 2014. MicroStrategy moved to dismiss the case, claiming that a forum selection clause in the Cloud Contract required OpenRisk to file its claims in Virginia.

15. While the case against MicroStrategy was pending in the Massachusetts court, MicroStrategy filed an action in Federal District Court in the Eastern District of Virginia, Alexandria Division (1:14-cv-01244) (the "First VA Action"), claiming breach of the Cloud Contract and that OpenRisk should pay for five years of services under the Cloud Contract. MicroStrategy filed that action even though it had terminated the Cloud Contract after a few months, conspired with Roston, Spectant and the Former Officers and facilitated their larceny of OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets, deleted the OpenRisk cloud environment and its contents, concealed the deletion in false testimony in the Massachusetts litigation and received from its Co-conspirators some of the payments that it claimed it was owed from OpenRisk.

16. On November 24, 2014, OpenRisk answered MicroStrategy's complaint in the First VA Action.

17. Also on November 24, 2014, OpenRisk received notice of the Massachusetts state court's ruling on MicroStrategy's motion to dismiss, which held that:

6

Defendant MicroStrategy's Motion to Dismiss is ALLOWED, conditioned on MicroStrategy's undertaking, made in writing and filed with this Court on or before December 1, 2014, that if on or before December 24, 2014,

(a)   OpenRisk moves for leave to add substantially the same claims as are dismissed in this action as counterclaims in the Eastern District of Virginia action [that is, the First VA action] (to which motion MicroStrategy will assent) and the motion is allowed, and/or

(b)   OpenRisk commences an action asserting such claims in a Virginia state court of competent jurisdiction,

MicroStrategy will not assert a statute of limitations or laches defense in the Virginia action(s).

If MicroStrategy does not so agree, it shall notify the Court in writing on or before December 1, 2014, and this case will remain in this session.

18.   On December 1, 2014, MicroStrategy filed an Undertaking in the Massachusetts state court case providing:

Pursuant to the Court's November 24, 2014 Order (Order) (Docket No. 21), Defendant MicroStrategy Services Corporation ("MicroStrategy") undertakes and represents that, if on or before December 24, 2014,

(a)   Plaintiff OpenRisk, LLC ("OpenRisk") moves for leave to add substantially the same claims as have been dismissed here, pursuant to the Order, as counterclaims in the Eastern District of Virginia action (to which MicroStrategy will assent) and the motion is allowed, and/or

(b)   OpenRisk commences an action asserting such claims in a Virginia state court of competent jurisdiction,

MicroStrategy will not assert a statute of limitations or laches defense in the Virginia action(s).

19.   On December 30, 2014, OpenRisk filed in the First VA Action an Amended Answer alleging five counterclaims against MicroStrategy.   On March 17, 2015, on MicroStrategy's motion to dismiss, the Court ordered the dismissal with prejudice of Count 1 (aiding and abetting breach of fiduciary duty), dismissal of Counts 4 (tortious interference) and 5 (VUTSA) with leave to amend, and allowed Counts 2 and 3

7

(common law and statutory conspiracy) to go forward.  On May 6, 2015, on MicroStrategy's motion for reconsideration of the Court's March 17, 2015 order on the motion to dismiss, the Court ordered the dismissal with prejudice of Counts 2 and 3 of OpenRisk's counterclaims.  On May 28, 2015, on OpenRisk's motion for reconsideration of the Court's May 6, 2015 order, the Court ordered the dismissal of Counts 2 and 3 of OpenRisk's counterclaims without prejudice and directed OpenRisk to pursue those claims in a separate action.  On June 20, two days before the scheduled trial of MicroStrategy's claim for breach of contract against OpenRisk, MicroStrategy filed a motion to voluntarily dismiss its claim.  On July 9, the Court ordered the dismissal of Counts 4 (tortious interference) and 5 (VUTSA) of OpenRisk's counterclaims to be without prejudice and granted MicroStrategy's motion to voluntarily dismiss its claim against OpenRisk with prejudice.

## THE PARTIES

20.    OpenRisk is a limited liability company formed  under the laws of the state of Delaware, with a principal place of business at 12 Waltham Street, Lexington,  Middlesex County, Massachusetts.  OpenRisk is registered as a foreign limited liability company in Massachusetts.  OpenRisk's members are:  five individuals residing in Massachusetts; two Massachusetts limited liability companies whose members reside in Massachusetts; a California trust whose trustee is a resident of California; a Massachusetts limited partnership whose members reside in Massachusetts; and a Florida limited  liability company whose sole member resides in New Jersey.

21.    MicroStrategy is a corporation  formed under the laws of the state of Delaware, with a principal place of business at 1850  Towers Crescent Plaza, Tysons Corner, Virginia.

8

## MICROSTRATEGY'S CO-CONSPIRATORS

22.    MicroStrategy's Co-conspirators include Roston, his companies (MNR Capital, Spectant and Arcvandam), the three Former Officers, Nitish Mathew and Dileep Shiva (collectively, the "Co-conspirators").

23.    Roston is an individual with a last known address at 104 Scotland Road, South Orange, New Jersey 07079, who now lives in Montana.

24.    MNR Capital is a limited liability company formed under the laws of the state of New Jersey with a principal place of business at 104 Scotland Road, South Orange, New Jersey 07079. Roston is a principal of MNR Capital.

25.    Spectant is a limited liability company formed under the laws of the state of New Jersey, with a principal place of business at 104 Scotland Road, South Orange, New Jersey 07079. Roston is a principal of Spectant.

26.    Arcvandam Corp. ("Arcvandam") is a corporation formed under the laws of the state of New Jersey, with a principal place of business at 104 Scotland Road, South Orange, New Jersey 07079. Roston is a principal of Arcvandam.

27.    On information and belief, Nitish Mathew and Dileep Shiva reside in Australia and India, respectively.

## OPENRISK'S VALUABLE CONFIDENTIAL INTELLECTUAL PROPERTY AND CONFIDENTIAL AND PROPRIETARY BUSINESS INFORMATION AND TRADE SECRETS

28.    OpenRisk's Platform would be the world's first private cloud-based hosting platform for catastrophe models offering to insurance and reinsurance companies – for the first time – web-based access to these catastrophe models.

29.    The principal value proposition of the OpenRisk Platform to insurance and

9

reinsurance companies was unprecedented speed and reducing or eliminating the need to maintain their own massive hardware systems, high-end modeling specialists and technological support. This could save the companies millions of dollars per year.

30. The additional value proposition of the OpenRisk Platform to the insurance industry included: (a) data certification and portfolio chain of custody; (b) simplified access to catastrophe models via a web-based uniform user interface; (c) data analytics provided using a private grid of Asymmetric Massively Parallel Processing (AMPP™) database appliance hardware from IBM/Netezza; (d) enterprise-grade business intelligence providing custom report generation using business intelligence software from MicroStrategy; (e) a custom "App Store"-type marketplace with data and analytical software add-ons to enhance property catastrophe data and improve modeling results; (f) a portal-based community where users can interact through a professional gateway and exchange data with authorized users; and (g) increased processing speed.

31. OpenRisk worked independently and together with its critical vendors and its other agents including Mathew, Shiva and the Former Officers to develop and to design the components of the OpenRisk Platform – including the associated proprietary architectural designs, the software and unique source code (such as specifications, test scripts and database formats).

32. The proprietary architectural design of the OpenRisk Platform was an interlocking package of technologies and subcontractor-partners, including (a) use of and customization of the MicroStrategy Business Intelligence or Cloud Intelligence Platform, (b) use of and customization of the "Adeptia Integration Suite" with software written by OpenRisk's vendor Adeptia, Inc., and (c) other technologies including packages named "Liferay" and "Alfresco" and related

customizations. This and all related work-product was OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets.

33. On about October 12, 2011, with MicroStrategy's assistance, the Co-conspirators moved OpenRisk property and information to a MicroStrategy cloud environment which had been created for OpenRisk by MicroStrategy pursuant to the parameters set forth in OpenRisk's proprietary architecture. The cloud environment was given the abbreviated name "ORSK." Later on December 13, 2011, MicroStrategy and the Co-conspirators duplicated the OpenRisk property and information in OpenRisk's cloud environment and moved the duplicate to a different MicroStrategy cloud environment code-named "C289," which was created for Co-conspirator Spectant by MicroStrategy and operated by Spectant. Spectant requested that this entirely new code-named cloud environment be created for it to house OpenRisk's information in order to help erase traces of OpenRisk's identity in the various components of the environment.

34. The use of a code name instead of a company's name for a cloud environment, e.g., "C289," was conceived by MicroStrategy to systematically conceal traces of the identity of the owner of information in order to avoid any future occurrence of the problem that had arisen by virtue of the misappropriation of OpenRisk's information.

35. MicroStrategy facilitated both the porting of OpenRisk's property and information from the IBM-owned system and others to the MicroStrategy-owned system in an OpenRisk-contracted environment, and the duplication and moving again of OpenRisk's property and information to a Spectant environment on the MicroStrategy system. Among other things, MicroStrategy assisted engineers working on behalf of Spectant in continuing work on the OpenRisk property and information.

36.     The overarching software infrastructure for the OpenRisk Platform was provided by the MicroStrategy "Business Intelligence" or "Cloud Intelligence" platform. These two systems are essentially the same; the difference is that the Business Intelligence version is licensed by a customer and installed on the customer's own computers, whereas the Cloud Intelligence version is licensed and installed in computers owned and maintained by MicroStrategy.

37.     OpenRisk initially developed the OpenRisk Platform on MicroStrategy's Business Intelligence platform which resided on an IBM/Netezza computer. Then, beginning October 11, 2011 when MicroStrategy completed configuration of a hosted environment for OpenRisk's use, development shifted to the MicroStrategy Cloud Intelligence version. That was the day after the three Former Officers, as part of the conspiracy against OpenRisk, resigned in concert. The Former Officers, in violation of their fiduciary and contractual duties to OpenRisk, made possible with MicroStrategy's assistance, had continued and unlawful access to OpenRisk's property even after their resignations from OpenRisk.

38.     The OpenRisk confidential intellectual property and confidential and proprietary business information and trade secrets that were ported over to the MicroStrategy cloud environment named "OpenRisk," which was set up by MicroStrategy by October 11, 2011, included the following:

- Metadata, located on one of the machines in OpenRisk's MicroStrategy Business Intelligence environment:
  \\10.24.11.10\orskashplprdcifs\uploads\MSTR_MD\OpenRisk_MD.zip;
- Netezza Database Dumps, located on the same OpenRisk machine at \\10.24.11.10\orskashplprdcifs\uploads\Netezza_DB_Dumps\openrisk-db-backup-Oct-13-11.tar.gz; and
- Web customizations.

39.     The "MicroStrategy MD" or meta-data was custom programming work for the

OpenRisk environment that was also the property of OpenRisk.

40.     Source code developed in collaboration and under contract with OpenRisk by IBM in the summer of 2011 includes the code referenced at the item above beginning "Netezza Database Dumps. . . ." The code in the latter file contains properly formatted database files and schema procedures for testing and reporting upon modeling activities. This valuable, proprietary code was owned by OpenRisk, and was also moved from the OpenRisk cloud environment to the Spectant "C289" cloud environment with the assistance of MicroStrategy.

41.     Specific pieces of OpenRisk's intellectual property including the following were developed by it and taken from it by Spectant with the assistance of MicroStrategy and others: (a) a configured web server within the MicroStrategy Business and/or Cloud Intelligence environment (layer 1 of the OpenRisk Platform); (b) customized portal code for the web server (layer 2 of the OpenRisk Platform) which included at least "Liferay" and "OpenIam" technology; (c) a configuration of Google Maps for the MicroStrategy Business Intelligence environment; (d) a set of web customizations including features such as: "hidePromptsIndex," "hideReportBar," hideReportDetails," and "renameRunReport"; (e) Visio files documenting the OpenRisk Platform architecture; (f) "glue code" instantiating the ideas in the Architecture; (g) database Schema files, containing database table definitions and Netezza stored procedure definitions ("CREATE OR REPLACE PROCEDURE"); and (h) at least 358 database files containing the "dump" file extension.

42.     Discovery in the Massachusetts litigation shows that, as late as August 16, 2012, Spectant continued to work with source code containing explicit pathname references to, and owned by, OpenRisk with the assistance of MicroStrategy. For example, this code was in the MicroStrategy "C289" cloud intelligence environment being operated by Spectant on August 16,

2012:

"\\corp-fs1-tech\TechSupp\CLIENTS\O\**OpenRiskLLC**[ID1026734]\550593\4713056."

43.     The foregoing paragraphs describe the OpenRisk confidential intellectual property and confidential and proprietary business information and trade secrets that were taken from OpenRisk by MicroStrategy and the Co-conspirators and which was deployed on the MicroStrategy cloud, and which MicroStrategy and the Co-conspirators then, in furtherance of the conspiracy, duplicated and unlawfully moved the duplicate from the OpenRisk cloud environment to the C289 cloud environment operated by Spectant.     Subsequent to this duplication and transfer which occurred on December 13, 2011 – the very same day MicroStrategy received a cease and desist letter from OpenRisk's counsel - MicroStrategy intentionally deleted the OpenRisk cloud environment and its contents on or about January 11, 2012 in order to deprive OpenRisk of its property and to further conceal the larceny of information within the cloud environment. MicroStrategy and the Co-conspirators knew that OpenRisk did not possess copies of its confidential intellectual property and confidential and proprietary business information and trade secrets and that their conduct deprived OpenRisk of possession and control of its property.

44.     In addition to the software platform, in 2011, OpenRisk had plans to develop two other innovative products:   the CAT RISK Index (also known as CRI), and the OpenRisk Risk Trading Exchange or OpenRx.

45.     The CRI was conceived to enable insurance securitization via the capital markets – offering for the first time a near real-time, portfolio specific CRI. The near real-time aspect of the CRI would be a major improvement over other insurance securitization products, such as CAT Bonds, Industry Loss Warranties and PCS Catastrophe Insurance Options.

46.     The OpenRx was conceived to enable – for the first time – trading of catastrophe risk related securities based on actual damage estimates and had the capability of being reported in near real time, the development of which requires a platform hosting multiple CAT models which had been non-existent and would have made the OpenRisk Platform the first of its kind and the first to enable trading of such near real-time products.

47.     OpenRisk at all times took the necessary and reasonable steps and made reasonable efforts to protect its confidential intellectual property and confidential and proprietary business information and trade secrets from disclosure to competitors and others outside of the company.  For example, OpenRisk required that each of the members of the Company, including the Former Officers, be a party to the Company's Operating Agreement, which has a confidentiality provision.  The Former Officers continue to be bound by the confidentiality provision even after their resignations from OpenRisk.

48.     In addition, each of the Former Officers was a party to a Service Agreement with OpenRisk promising that they would not use OpenRisk's property for his own benefit. As with the confidentiality provision in the Operating Agreement, the Former Officers continue to be bound by their contractual obligation not to use OpenRisk's property for their own benefit even after their resignations from OpenRisk.  OpenRisk demanded that the Former Officers return its property when they left.  In violation of their contractual and fiduciary duties, they did not.

49.     Further, OpenRisk's Chief Technology Officer Shajy Mathai, who had a relationship of trust and confidence with OpenRisk and while employed by the Company was prohibited from managing any person in competition with OpenRisk, and whose responsibility under his Service Agreement included "the design, architecture, development, management and oversight of all software and hardware development," hired Nitish Mathew based in India with

whom he had experience working on the proprietary "i-aXs" modeling platform team while both were employed at Guy Carpenter & Company in New York.   Mathew had recent experience as the Director of Business Intelligence at Cablevision in New York and was also a former technical support engineer at MicroStrategy experienced in using its business intelligence software, data modeling, ETL and BPM processes, report generation, and reporting management and optimization.   Mathai also hired Dileep Shiva in India who was well versed in MicroStrategy software customizations and experienced in portal application design and computer network architecture.

50.   Both Mathew and Shiva were paid by OpenRisk to work on the development of the proprietary OpenRisk Platform, including its business intelligence, data warehousing, customizations, user management and network security features at a salary of $5,000 per month starting in March 2011 and in addition both were sent 10.3% of the $5,000-- $515 per month, for the payment of their taxes to the Government of India.  Prior to Mathai hiring Mathew, Mathai (the OpenRisk CTO who was responsible for both hiring and managing Mathew and Shiva), told the OpenRisk CEO the details of Mathew's experience and that Mathew was trustworthy. OpenRisk subsequently agreed with Mathew and Shiva on their employment terms including that OpenRisk would pay Mathew and Shiva a salary of $5,000 each per month starting in March 2011 plus 10.3%so they could each pay their applicable India tax.  All further agreed that they would eventually enter into written employment agreements with the company.   Both Mathew and Shiva, who were under the management and control of OpenRisk's Chief Technology Officer, Mathai, at all relevant times, were provided OpenRisk email addresses in the OpenRisk email system, login and password information to access OpenRisk's stored confidential technology documents, and were under a duty to keep OpenRisk's information confidential at all

times.

51.     Further to protecting its confidential intellectual property and confidential and proprietary business information and trade secrets from disclosure to competitors and others outside of the company, OpenRisk also entered into non-disclosure agreements with vendors, investors and prospective vendors and investors.

52.     MicroStrategy and its Co-conspirators knew that the Former Officers, Mathew and Shiva owed express or implied contractual and fiduciary obligations to OpenRisk as current and former members, officers, employees, agents and/or consultants of OpenRisk – including obligations to maintain the confidentiality of OpenRisk's confidential and proprietary information, obligations not to usurp or interfere with OpenRisk's business opportunities, and obligations not to use OpenRisk's property for their own benefit.  MicroStrategy's email communications to OpenRisk and the Former Officers, Mathew and Shiva contained standard confidentiality clauses evidencing the joint understanding that the information involved in the work and services being performed by the parties was confidential in nature.

53.     Prior to entering into the Cloud Contract with OpenRisk, MicroStrategy received a copy of OpenRisk's Operating Agreement.

54.     Section 8.07 of OpenRisk's Operating agreement provides:

Confidentiality.

(a) Unless otherwise determined by the Board of Directors, each Member shall, and shall cause its officers, directors, stockholders, employees, independent contractors, managers, members, trustees and general and limited partners to, hold in strict confidence, and shall not use except to the extent contemplated otherwise in this Agreement or any Ancillary Document, any information it receives regarding the Company, its business or the business of any Member (or its Affiliates), whether such information is received from the Company, any other Member or its Affiliates, or another person; [intentionally omitted]

(b) The rights and obligations of a Member pursuant to this Section 8.07 shall continue following the time it ceases to be a Member and shall survive any dissolution and liquidation of the Company and/or termination of this Agreement.

(c) Each Member acknowledges that disclosure of information in violation of the provisions of this Section 8.07 would cause irreparable harm to the Company and the Members for which monetary damages are inadequate, difficult to compute, or both. Accordingly, each Member agrees that its obligations under this Section 8.07 may be enforced by specific performance and that breaches or prospective breaches of this Section 8.07 may be enjoined."

55.     The OpenRisk Operating Agreement defines "Ancillary Documents" to mean, collectively the Service Agreements, Consulting Agreement, and any other agreements executed and delivered in connection herewith or therewith; the OpenRisk Operating Agreement defines "Service Agreements" to mean those agreements entered into by and between OpenRisk and each of Shajy Mathai, Craig Ott, and Richard Murnane – that is, the Former Officers – in conjunction with execution of the Operating Agreement; the Operating Agreement defines "Service Members" to mean each of Shajy Mathai, Craig Ott and Richard Murnane.

56.     MicroStrategy knew that the Former Officers had continuing obligations of confidentiality to OpenRisk under the terms of the Operating Agreement even after they resigned from OpenRisk.

57.     MicroStrategy knew that under the terms of the OpenRisk Operating Agreement, a member of OpenRisk is prohibited from competing with OpenRisk while he is a member and for a period of two years after he stops being a member.

58.     MicroStrategy also knew that the OpenRisk's Operating Agreement prohibited the Service Members (defined by the Operating Agreement as the Former Officers Mathai, Ott and Murnane) for a period of three years after the cessation of the Former Officers' membership from inducing, recruiting or soliciting any of OpenRisk's agents to terminate any contractual arrangement with OpenRisk and prohibited the Former Officers from entering into another

contractual or employment arrangement with any such third party.

## OPENRISK'S CUSTOMERS, PROSPECTIVE CUSTOMERS
## AND OTHER BUSINESS OPPORTUNITIES

59.     Within its first nine months of operations, OpenRisk was well underway with the development of its software platform and was working with a number of vendors – including CIGNEX Technologies, Inc. ("CIGNEX"), Adeptia, IBM and others to fully commercialize the Platform.

60.     OpenRisk projected at the time that – for the Platform alone – within the first five years of operations, it would earn more than $150 million in revenues at high profit margins. This did not include projected revenues from the CRI or OpenRX or potential revenues from the ability to process CAT models at unprecedented speeds.

61.     The technology and insurance industry took notice of OpenRisk's promising new products and progress towards development.

62.     In June 2011, OpenRisk's development partner, IBM, awarded OpenRisk a prestigious technology innovation award for the OpenRisk Platform. As a critical part of the development of the OpenRisk Platform, IBM worked with OpenRisk in 2011 to develop a fully ported hurricane model capable of running on its AMPP$^{TM}$. IBM referred to this work as the "crown jewel" in its portfolio and published an OpenRisk case study showing the value of "In-Database Analytics".

63.     In September 2011, OpenRisk was in contract negotiations with AIG/Chartis ("AIG") – the largest insurance carrier in the world – to develop a product. Milestone payments under the contract would have totaled as much as $9 million over three years.

64.     MicroStrategy knew about OpenRisk's ongoing contract negotiations with AIG/Chartis. OpenRisk shared with MicroStrategy the documentation that was used by

19

OpenRisk to make a proposal for the contract with AIG. Upon information and belief, MicroStrategy assisted and discussed with OpenRisk how to improve the contract documentation, including a Statement of Work.

65. As a direct result of the misconduct of MicroStrategy and its Co-conspirators in furtherance of the conspiracy, OpenRisk ultimately could not pursue the contract or other business opportunities with AIG/Chartis, and the Co-conspirators supplanted OpenRisk in the discussions with AIG/Chartis regarding their progress developing the technology of the OpenRisk Platform which had been stolen from OpenRisk. These discussions continued until at least December 2012 when AIG/Chartis hired one of the Former Officers upon the expiration of his non-compete with OpenRisk.

66. Also in September 2011, Guy Carpenter & Company, LLC ("Guy Carpenter") – a $1 billion global reinsurance intermediary – was pursuing an agreement with OpenRisk whereby OpenRisk would provide its Platform among reinsurers exclusively to Guy Carpenter.

67. Also in September 2011, OpenRisk had an escrow account in place with over $430,000 of additional investment capital and commitments from at least three of its shareholders to further fund the company's development.

## MARC ROSTON'S FAILED ATTEMPT TO GAIN A CONTROLLING INTEREST IN OPENRISK

68. In August 2011, Marc Roston was introduced to OpenRisk as a potential investor and had expressed an interest in investing $200,000 at an $8 million valuation. After conducting some due diligence, in September 2011, Roston and MNR Capital made a bid to acquire a controlling interest in OpenRisk for $200,000. This was consistent with a valuation of OpenRisk at approximately $400,000 – or just a fraction of the $9 million approximate valuation of OpenRisk in August 2011 by another investor.

69. As part of his plan to effect this transaction, Roston secretly offered the Former Officers (who were then still at OpenRisk) a 10% commission on sales as part of their compensation should he and/or MNR Capital become the controlling owner of OpenRisk. This was a significant amount considering that, at the time, OpenRisk had more than $9 million in potential revenues from contracts then in the works.

70. OpenRisk refused Roston's offers including the offer that expired on October 11, 2011, the day after the Former Officers resigned in concert and the offer that expired on November 1, 2011.

## THE CO-CONSPIRATOR'S FORMATION OF SPECTANT AND SCHEMING AGAINST OPENRISK

71. OpenRisk did not realize at the time that Roston was not going to give up after the negotiations between him and OpenRisk failed to result in a transaction because he wanted OpenRisk's valuable intellectual property and promise for a lucrative business – whether he got it lawfully or not.

72. Subsequent to the failed negotiations between OpenRisk and Roston/MNR Capital, Roston formed Spectant, intending it as a repository for OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets.

73. Roston had earlier persuaded the Former Officers to join his scheme and, at his urging, on October 10, 2011, they resigned from OpenRisk (notifying OpenRisk of these resignations by e-mail on October 11, 2011), the day before Roston's offer to OpenRisk for a controlling interest in OpenRisk expired, thereby attempting to leverage OpenRisk's acceptance of the offer with the departure of three of its key officers and employees.

## MICROSTRATEGY'S WILLFUL AND MALICIOUS PARTICIPATION
## IN THE CONSPIRACY AGAINST OPENRISK

74.    Meanwhile, OpenRisk had entered into the Cloud Contract with MicroStrategy for cloud services. OpenRisk signed the Cloud Contract on September 28, 2011, and MicroStrategy signed it the next day.

75.    On October 6, 10, and 14, 2011, one of the Former Officers – OpenRisk's President Craig Ott – met with MicroStrategy. October 11, 2011 was the day the Former Officers notified OpenRisk by e-mail of their resignations. MicroStrategy's business records indicate that the meetings on October 6 and 14 were held "to confirm payment schedule and to review plan to on-board cloud." MicroStrategy email indicates that the meeting on October 10 was held to "get the full scoop" from Mr. Ott.

76.    Although OpenRisk did not know it at the time, immediately after the Former Officers resigned, on or about October 12, 2011, MicroStrategy began to actively work with the Co-conspirators to unlawfully transfer OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets onto the cloud provided by MicroStrategy pursuant to the Cloud Contract, by giving them unauthorized access to OpenRisk's cloud environment which had been built by MicroStrategy in accordance with proprietary OpenRisk architectural drawings provided to MicroStrategy by OpenRisk. Included in the information that was transferred was OpenRisk's confidential customized MicroStrategy metadata, IBM/Netezza database dumps, and OpenRisk Web customizations.

77.    Although OpenRisk did not know it at the time, the Co-conspirators made payments on the Cloud Contract. On October 31, 2011, one of the Former Officers paid $15,000 to MicroStrategy, which was the amount then due from OpenRisk under the Cloud Contract. Roston later reimbursed the Former Officer. OpenRisk and Roston had jockeyed back and forth

in the course of negotiations over whether Roston or OpenRisk should pay the $15,000 due from OpenRisk to MicroStrategy on October 31, 2011, but no agreement on that was reached and MicroStrategy and its Co-conspirators deliberately concealed from OpenRisk that the Former Officer made the payment.

78.    MicroStrategy also concealed from OpenRisk that MicroStrategy was giving the Co-conspirators unauthorized access to OpenRisk's environment on the MicroStrategy cloud and the confidential intellectual property and confidential and proprietary business information and trade secrets on the cloud.   Indeed, MicroStrategy intentionally misled OpenRisk about the $15,000 payment – falsely advising OpenRisk on multiple occasions that the amount was outstanding, including on November 1, 2011, when MicroStrategy advised that it would allow an extra day for OpenRisk to make the payment.  But as of November 1, 2011, MicroStrategy had already accepted the payment of the $15,000 on the OpenRisk account from the Former Officer Shajy Mathai, knowing that Mathai was no longer an employee of OpenRisk.  MicroStrategy's disingenuous attempts to collect the $15,000 a second time from OpenRisk after Mathai had already paid MicroStrategy, was to cause harm to OpenRisk in furtherance of the conspiracy.

79.    The pressure by MicroStrategy on OpenRisk to pay amounts that it did not owe for services that it was not receiving furthered the conspiracy because, meanwhile, Roston continued to pressure OpenRisk – which had suffered from the loss of its key officers and employees and their know-how and OpenRisk property which the Former Officers refused to return – to accept his low-ball offer for a controlling stake in OpenRisk.  OpenRisk still refused.

80.    In furtherance of the conspiracy, despite knowledge that the negotiations with Roston for an acquisition of OpenRisk had fallen through on November 1 and the instruction from OpenRisk's Jim Aylward in a November 9, 2011 email to "[p]lease discontinue all services,"

MicroStrategy Account Executive Jordan Christopher, who was the account manager on the Cloud Contract, communicated with Former OpenRisk Chief Technology Officer and Co-conspirator Shajy Mathai on November 10, 2011 and proposed the following:

> "The way I'd like to present this to MicroStrategy is not that [O]penRisk has stopped operations but that assets and liabilities have been acquired by a new investor/entity and that all contracts need to be transferred to the new entity. That will leave all terms intact. Do you think we could position it this way?"

Mathai's response the same date to this proposed false summary of the status quo and relationship between Spectant and OpenRisk was a short and simple agreement: "That's pretty much wat [sic] we would like to do. They have said there is no going concern." Following that exchange Mr. Christopher communicated in writing numerous times in November 2011 within MicroStrategy, including to his sales supervisor Brian Reitenauer, and to representatives of the cloud IT department and the accounting department, the falsehood that Spectant had acquired OpenRisk's assets and that OpenRisk's cloud contract agreement was being reassigned. The false representation was in turn further transmitted within MicroStrategy including to the co-heads of the Cloud department, Steve Stone and Tim Bradley, who had been contacted and hired by CEO Michael Saylor to run the new department.

81.    In early November, OpenRisk's CEO Aylward sent numerous requests by email and telephone voicemail to MicroStrategy's Account Executive Jordan Christopher asking Mr. Christopher to contact him to discuss the contract between the companies. Instead of contacting Mr. Aylward to discuss the situation, Mr. Christopher asked the Former Chief Technology Officer Mathai whether he, Christopher, should avoid Mr. Aylward, and Mathai's response was to do just that. Mr. Christopher complied with the former employee, ignoring these requests for discussion from CEO Aylward.

82.    In late November, OpenRisk's CEO Aylward contacted MicroStrategy's

accounting department and asked for a return phone call regarding the company account. The following week the accounting department telephoned Mr. Aylward and explained that either the "CFO or CEO" of the company had made two $15,000 payments to the OpenRisk account at MicroStrategy on October 31, 2011, one by wire and one by ACH bank transfer, and that the latter of the two payments was reversed upon urgent request the following day. The accounting department also emailed an image of a wire document showing a payment of $15,000 was made to MicroStrategy by Former Chief Technology Officer Shajy Mathai on October 31, 2011 "FBO [for the benefit of] OpenRisk." This payment was not authorized by OpenRisk, was not previously disclosed to OpenRisk, and was actively concealed by MicroStrategy on November 1, 2011 when its Account Executive Mr. Christopher emailed OpenRisk CEO Aylward indicating that there was an "extra day" to make such payment and to confirm with him when and if such payment was made, even though Mr. Christopher knew that the payment had been made the day prior by the Former Chief Technology Officer.

83.     On November 30, 2011, a second payment of $15,000 was due from OpenRisk under the Cloud Contract. Upon request and agreement with Mr. Christopher, one of the Co-conspirators paid MicroStrategy that amount on November 29, 2011. Again, MicroStrategy furthered the conspiracy by concealing from OpenRisk that this payment had been made. When OpenRisk's CEO asked MicroStrategy's accounting department in early December if another payment had been made on the OpenRisk account, Mr. Christopher, together with the representative from the accounting department, concocted an email which the accounting representative sent to OpenRisk's CEO on about December 2, 2011. The email did not answer the query whether another payment had been made on the account, but instead concealed the fact that a second payment had been made by asking CEO Aylward whether he knew of any payment. The email thus purposely concealed the fact that the second payment of $15,000 had been made

and was designed to conceal the fact that Spectant was working with MicroStrategy to continue unlawfully the development of OpenRisk's Platform technology that had been misappropriated from OpenRisk.

84.    On November 29, 2011, OpenRisk filed a lawsuit against the three Former Officers in Suffolk County Superior Court in Boston, Massachusetts, alleging, *inter alia*, breaches of fiduciary duties, tortious interference with contractual relations, common law and statutory misappropriation of confidential information and trade secrets, civil conspiracy, aiding and abetting and usurpation of corporate opportunities. By December 4, Roston, the CEO of Spectant, learned of this lawsuit from OpenRisk's Former President Mr. Ott and was sent a copy of it on December 9, 2011 by the Former Chief Technology Officer Mr. Mathai.

85.    On December 6, 2011, MicroStrategy's Account Executive, Mr. Christopher, sent a request to MicroStrategy's technical support department to have the email addresses for the two company support liaisons for OpenRisk's cloud environment changed to Spectant email addresses which he provided and which request was met by the technical support department. This was done in order to facilitate access by Spectant to, and transfer to it of, the information in the OpenRisk cloud environment. By December 7, 2011, work was underway at MicroStrategy to set up a separate cloud environment for Spectant despite it having no cloud contract.

86.    MicroStrategy's willful and malicious participation in the conspiracy continued even after it received a cease and desist letter sent by OpenRisk's counsel on December 13, 2011. In the letter, OpenRisk advised that the Former Officers had failed to return OpenRisk property, including its trade secrets, and requested that MicroStrategy "cease and refrain from doing any work and making any efforts to  commercialize the OpenRisk property with these former employees." By contrast, when a similar cease and desist letter was sent December 19, 2011 to OpenRisk's critical vendor IBM, IBM heeded OpenRisk's request not to continue working with

the Former Officers.

87.     At the time, OpenRisk did not know that Spectant existed or that MicroStrategy was providing it and the Co-conspirators, who included the Former Officers, unauthorized access to OpenRisk's environment on the MicroStrategy cloud containing confidential intellectual property and confidential and proprietary business information and trade secrets of OpenRisk. Even after receiving the cease and desist letter, in furtherance of the conspiracy, MicroStrategy did not cease, desist, or advise OpenRisk of the larceny or conspiracy against it.     In fact, MicroStrategy completed duplicating the information in OpenRisk's cloud environment and transferring this information to Spectant's cloud environment on the evening of December 13, 2011, the same day it received the cease and desist letter.

88.     Further upon information and belief, in November and December 2011, MicroStrategy considered sending a letter of reassignment to OpenRisk i seeking OpenRisk's consent to having its confidential intellectual property and confidential and proprietary business information and trade secrets on its cloud environment transferred to Spectant. Because sending such a letter to OpenRisk would have revealed MicroStrategy's active participation in a conspiracy against OpenRisk, MicroStrategy never sent the letter to OpenRisk evidencing its willfulness and malicious intent. In or around the same time, MicroStrategy was demanding from OpenRisk payments on the Cloud Contract for which OpenRisk was receiving no services and for which MicroStrategy had actually been instead rendering services to the Co-conspirators and had been paid by its Co-conspirators Mathai and Spectant.

89.     On or about January 1, 2012, Spectant made a payment of $63,000 to MicroStrategy. This is the amount that would have been due at the time from OpenRisk under the Cloud Contract.

90.     On or about January 3, 2012, Roston signed on behalf of Spectant a cloud contract with MicroStrategy. The  contract between Spectant and MicroStrategy was essentially identical to the OpenRisk/MicroStrategy contract in all respects except that the Spectant/MicroStrategy contract did not require the set up fees (the two $15,000 payments) that the OpenRisk/MicroStrategy contract called for and which Spectant had already paid. The contract did require an initial payment of $63,000 the purpose of which was not described in the contract itself but which payment was made by Spectant at the time of the signing of the contract for the Q4 cloud services rendered secretly by MicroStrategy to Spectant in connection with the OpenRisk cloud environment in furtherance of the conspiracy.

91.     On or about January 11, 2012, MicroStrategy, without any authority from, or knowledge on the part of, OpenRisk, intentionally and unlawfully deleted the OpenRisk cloud environment and all the information that was contained in it.

92.     On about January 20, 2012, MicroStrategy sent a letter to OpenRisk purporting to provide 30-days' notice of MicroStrategy's intent to terminate the Cloud Contract for OpenRisk's failure to pay $63,000 for 4th quarter 2011 cloud services on January 1, 2012, despite the fact that MicroStrategy had already accepted a payment of $63,000 from Spectant for these services for which only it had received any benefit.  In so doing, MicroStrategy further concealed its participation in the conspiracy and willfully and maliciously furthered it.  MicroStrategy did not say in the letter that the $63,000 had in fact already been paid by Spectant or that MicroStrategy had facilitated the Co-conspirators' larceny of OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets by granting to the Co-conspirators unauthorized access to OpenRisk's cloud environment. Nor did the letter reveal that the OpenRisk cloud environment and the information in it had been unlawfully destroyed by

MicroStrategy only nine (9) days earlier.

93. MicroStrategy also furthered the conspiracy by providing Spectant additional services, including the development of a mobile platform application which service had been originally contemplated by OpenRisk, and by providing Spectant with marketing assistance, including a speaker opportunity at the MicroStrategy World trade show held in January 2012 in Miami, Florida, at which the Former Chief Technology Officer Mr. Mathai spoke regarding the OpenRisk technology as if it belonged to Spectant.

94. MicroStrategy also furthered the conspiracy in the deposition of its Rule 30(b)(6) representative Jorge Jimenez in the Suffolk County, Boston, Massachusetts lawsuit, held in September 2013. At that deposition, Mr. Jimenez testified falsely on behalf of MicroStrategy that there was no deletion of OpenRisk's information in the cloud. Jimenez further testified that "to me OpenRisk and Spectant were always one customer environment. I cannot make a distinction and tell you this file is OpenRisk and this file is Spectant. I cannot. To me it was always a single environment." Jimenez further testified that "it doesn't matter Spectant or OpenRisk to us. It's one customer."

95. MicroStrategy also sought to conceal its participation in the conspiracy and to further it when it filed the First VA action in Federal District Court in the Eastern District of Virginia in the Alexandria Division (1:14-cv-01244) on September 19, 2014 against OpenRisk. The breach of contract claim that it asserted against OpenRisk in that action was for payments under the Cloud Contract that were in fact at least in part made by Spectant and the Co-conspirators through the fall of 2012. The claim was also based on unsupported allegations that MicroStrategy provided services under the Cloud Contract to OpenRisk when instead it had provided services to Spectant and did not acknowledge MicroStrategy's subsequent provision of services to Spectant as a result of MicroStrategy's facilitating the larceny of OpenRisk's

confidential intellectual property and confidential and proprietary business information and trade secrets. That breach of contract claim was withdrawn pursuant to motion filed by MicroStrategy on Saturday, June 20, 2015, on the eve of a trial set to commence on Monday, June 22, 2015.

96. OpenRisk has been damaged by MicroStrategy's participation in the conspiracy and other unlawful acts. The embezzlement, larceny and conversion of OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets would not have been possible without MicroStrategy's conduct and facilitation because the Co-conspirators needed the MicroStrategy cloud space that MicroStrategy had set up in accordance with proprietary OpenRisk architectural drawings in order to transfer OpenRisk's information. With the embezzlement, larceny, and conversion, OpenRisk's efforts to develop and market its products ground to a halt and its business prospects evaporated. Instead of reaping the benefits of the prospective contracts that it had lined up before the conspiracy, OpenRisk has been mired in expensive litigation to get back what was unlawfully taken from it.

## CAUSES OF ACTION

### CLAIM I
### CONVERSION

97. OpenRisk realleges and incorporates by reference paragraphs 1 through 96.

98. The confidential intellectual property and confidential and proprietary business and trade secret information that MicroStrategy and its Co-conspirators withheld following the resignations of the Former Officers and OpenRisk's requests for return of said information, belongs to OpenRisk and OpenRisk is entitled to immediate possession of such information.

99. The confidential intellectual property and confidential and proprietary business and trade secret information in OpenRisk's cloud environment that MicroStrategy and/or its Co-conspirators duplicated and transferred to Spectant's cloud environment, belongs to OpenRisk and

OpenRisk is entitled to immediate possession of such information.

100.    MicroStrategy and its Co-conspirators wrongfully converted OpenRisk's confidential intellectual property and confidential and proprietary business and trade secret information when MicroStrategy and its Co-conspirators retained and used such confidential information, wrongfully exercised dominion and control over such, and intentionally deprived OpenRisk of its possession and use.

101.    MicroStrategy and its Co-conspirators wrongfully retained and used, exercised dominion and control over, and intentionally deprived OpenRisk of the possession and use of OpenRisk's confidential intellectual property and confidential and proprietary business and trade secret information in a tangible medium, namely in computer servers, both before and after the duplication and transfer of such confidential information to Spectant's cloud environment.

102.    OpenRisk has suffered and will continue to suffer harm as a result of MicroStrategy's actions.

## CLAIM II
## TORTIOUS INTEFERENCE WITH CONTRACT

103.    OpenRisk realleges and incorporates by reference paragraphs 1 through 102.

104.    OpenRisk required that each of the members of the Company, including the Former Officers, be a party to the Company's Operating Agreement, which has a Confidentiality provision. The Former Officers continue to be bound by the Confidentiality provisions even after their resignations from OpenRisk.

105.    In addition, each of the Former Officers was a party to a Service Agreement with OpenRisk, by which each promised that he would not use OpenRisk's property for his own benefit. As with the Confidentiality provision in the Operating Agreement, the Former Officers continue to be bound by their contractual obligations under the Service Agreements not to use

OpenRisk's property for their own benefit even after their resignations from OpenRisk. OpenRisk demanded that the Former Officers return its property when they left OpenRisk. In violation of their contractual and fiduciary duties, they did not.

106. Prior to entering into the Cloud Contract with OpenRisk, MicroStrategy received a copy of OpenRisk's Operating Agreement.

107. MicroStrategy and the Co-conspirators knew that the Former Officers owed contractual and fiduciary obligations to OpenRisk as current and former members, officers and employees of OpenRisk – including obligations to maintain the confidentiality of OpenRisk's intellectual property and proprietary business and trade secret information, obligations not to usurp or interfere with OpenRisk's business opportunities, and obligations not to use OpenRisk's property for their own benefit.

108. MicroStrategy and the Co-conspirators also knew that OpenRisk's Operating Agreement prohibited the Service Members (defined by the Operating Agreement as the Former Officers Mathai, Ott and Murnane) for a period of three years after the cessation of the Former Officers' membership from inducing, recruiting or soliciting any of OpenRisk's agents to terminate any contractual arrangement with OpenRisk and prohibited the Former Officers from entering into another contractual or employment arrangement with any such third party.

109. MicroStrategy facilitated the Co-conspirators' larceny of OpenRisk's confidential intellectual property and confidential and proprietary business and trade secret information by granting to the Co-conspirators unauthorized access to OpenRisk's cloud environment which intentionally interfered with the Former Officers continuing post-resignation contractual obligations to OpenRisk under both the Operating Agreement and the Service Agreements.

110. MicroStrategy, before and after the payment on October 31 and the request on

November 9 to discontinue all services to OpenRisk, gave the Former Officers, Mathew and Shiva access to OpenRisk's cloud environment hosted by MicroStrategy, and after the payment and request to discontinue all services, gave Spectant (which Roston formed on November 10, 2011), access to OpenRisk's cloud environment hosted by MicroStrategy allowing Roston/Spectant access to the proprietary work product of OpenRisk and allowing Roston/Spectant use of that environment to secretly pick up the development on the OpenRisk Platform where OpenRisk left off when its Former Officers resigned in concert on October 10, 2011 to secretly join Roston. MicroStrategy intentionally interfered with the Former Officers' obligations under both the OpenRisk Operating Agreement and the Service Agreements.

111. OpenRisk has suffered and will continue to suffer harm as a result of MicroStrategy's and the Co-conspirators' actions.

**CLAIM III**
**MISAPPROPRIATION OF TRADE SECRETS**
**VIRGINIA UNIFORM TRADE SECRETS ACT, VA. CODE ANN. § 59.1-336.**

112. OpenRisk realleges and incorporates by reference paragraphs 1 through 111.

113. MicroStrategy and the Co-conspirators misappropriated OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets relating to the OpenRisk Platform, including source code, software architecture, software programs, compilations, schemas, proprietary business documentation and other materials. This information, as more specifically set forth in paragraphs 31-32, 38 - 42 includes, but is not limited to, the information moved into the ORSK cloud environment and the information moved from the ORSK environment into the C289 cloud environment, and some of which is protectable as a trade secret, in that OpenRisk derives independent economic value, actual or potential from the information not being generally known to and not being readily ascertainable by proper means

by, other persons who can obtain economic value from the information's disclosure or use, and was the subject of efforts by OpenRisk to protect it that are reasonable under the circumstances to maintain its secrecy.

114.    MicroStrategy and the Co-conspirators misappropriated OpenRisk's trade secret information by entering into and carrying out an agreement which called for: the transfer of the OpenRisk information into the OpenRisk "ORSK" cloud environment created by MicroStrategy; for the continued unauthorized access of the Co-conspirators to the "ORSK" cloud environment even after OpenRisk requested that MicroStrategy discontinue all services; for the creation by MicroStrategy of a new "C289" cloud environment with the same structure and design as the "ORSK" cloud environment using the proprietary OpenRisk architectural drawings and intended to conceal traces of OpenRisk from the new cloud environment; for the transfer from the "ORSK" environment of the OpenRisk information to the "C289" environment; and  for the concealment of the agreement from OpenRisk.

115.    The confidential intellectual property and confidential and proprietary business information that was misappropriated by MicroStrategy and the Co-conspirators thus includes information that constitutes trade secrets under the Virginia Uniform Trade Secrets Act, Va. Code Ann. § 59.1-336.

116.    OpenRisk has suffered and will continue to suffer actual losses as a result of MicroStrategy's and the Co-conspirators' misappropriation of trade secrets in that OpenRisk has been prevented by the misappropriation from developing the OpenRisk Platform and bringing it to the marketplace, thus causing OpenRisk to lose value and/or sales.

117.    In addition, MicroStrategy has been unjustly enriched by the revenues gained in its contracts with the Co-conspirators, including the Spectant contracts, which revenues would

not have occurred without the misappropriation of OpenRisk's trade secrets and other information.

118.    MicroStrategy's misappropriation was willful and malicious, thus entitling OpenRisk to punitive damages pursuant to Va. Code § 59.1-338(B) and attorneys' fees pursuant to Va. Code § 59.1-338.1.

## CLAIM IV
## VIOLATION OF VIRGINIA COMPUTER CRIMES ACT
## VA. CODE ANN. § 18.2 – 152.3 ET SEQ.

119.    OpenRisk realleges and incorporates by reference paragraphs 1 through 118.

120.    MicroStrategy and its Co-conspirators have used a computer or computer network without authority and have embezzled, committed larceny of the property, and converted the property of OpenRisk in violation of Va. Code Ann. § 18.2-152.3.

121.    MicroStrategy and its Co-conspirators have altered and/or erased computer data, a computer program and/or a computer network in violation of § 18.2-152.4.

122.    MicroStrategy and its Co-conspirators have used a computer or computer network to make or cause to be made an unauthorized copy of computer data, computer program(s) and/or computer software residing in, communicated by, or produced by computers and/or computer network in violation of Va. Code Ann. § 18.2-152.4.

123.    OpenRisk is entitled to the relief provided in Va. Code Ann. § 18.2-152.12, including (a) its damages, including but not limited to its lost profits; and (b) the costs of suit.

## CLAIM V
## BUSINESS CONSPIRACY IN VIOLATION OF
## VIRGINIA CODE §§ 18.2-499 – 18.2-500

124.    OpenRisk realleges and incorporates by reference paragraphs 1 through 123.

125.    MicroStrategy combined with the Co-conspirators for the purpose of willfully and

maliciously injuring OpenRisk in reputation, trade, business or profession – by, among other things, embezzling OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets, facilitating the Co-conspirators' larceny of OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets through granting unauthorized access to OpenRisk's cloud environment which had been set up by MicroStrategy pursuant to proprietary OpenRisk architectural drawings, and by deliberately and repeatedly concealing the larceny through, among other things, demanding payment from OpenRisk for services that it was not receiving, which instead were secretly being rendered by MicroStrategy to Spectant, and for which the Co-conspirators in fact paid, by destroying the OpenRisk cloud environment and its contents which belonged to OpenRisk, and by testifying falsely in September 2013 that it had not deleted any such information.

126.    As a direct and proximate result of MicroStrategy's participation in the conspiracy, OpenRisk has suffered damages exceeding $10 million.

## CLAIM VI
## COMMON LAW CONSPIRACY

127.    OpenRisk realleges and incorporates by reference paragraphs 1 through 126.

128.    MicroStrategy combined with the Co-conspirators to accomplish, by concerted action, by criminal or unlawful purpose, and by criminal or unlawful means – by, among other things, embezzling OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets which OpenRisk stored in a cloud environment and on computer hardware provided and owned and/or controlled by MicroStrategy; converting OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets; facilitating the Co-conspirators' larceny of OpenRisk's confidential intellectual property and confidential and proprietary business information and trade

secrets by continuing to allow unauthorized access to the Co-conspirators to the OpenRisk cloud environment even after MicroStrategy was asked by OpenRisk to discontinue all services and after MicroStrategy knew the Co-conspirators had left the employ of OpenRisk or otherwise had no affiliation with OpenRisk; by creating a new "C289" cloud environment at the request of Spectant with the same structure and design as the OpenRisk cloud environment based on the same proprietary OpenRisk architectural drawings provided to it; by facilitating the duplication and transfer of all of OpenRisk's confidential intellectual property and confidential and proprietary business information and trade secrets from the OpenRisk "ORSK" cloud environment to the Spectant "C289" cloud environment; by deleting the data in the OpenRisk cloud environment and the OpenRisk cloud environment itself; and by deliberately and repeatedly concealing the larceny through, among other things, avoiding OpenRisk's requests for communications and misrepresenting and concealing the making of payments by the Co-conspirators on OpenRisk's account; by demanding payment from OpenRisk for services for which the Co-conspirators in fact paid while failing to disclose the unlawful use, duplication, transfer and deletion of OpenRisk's data and cloud environment.

129.    As a direct and proximate result of MicroStrategy's acts committed in furtherance of the conspiracy, OpenRisk has suffered damages exceeding $10 million.

## PRAYER FOR RELIEF

WHEREFORE, OpenRisk requests that this Court:

1) Enter an order requiring MicroStrategy to pay to OpenRisk compensatory and incidental damages for MicroStrategy's and its Co-conspirators' conversion of OpenRisk's property;

2) Enter an order requiring MicroStrategy to pay to OpenRisk compensatory, incidental

and punitive damages for MicroStrategy's and its Co-conspirators' tortious interference with contract;

3) Enter an order requiring MicroStrategy to pay to OpenRisk compensatory and incidental damages, including but not limited to its lost profits, and its costs of suit, pursuant to Va. Code § 18.2-152.12;

4) Enter an order requiring MicroStrategy to pay to OpenRisk damages, including treble damages, and attorneys' fees, pursuant to Va. Code Ann. § 18.2-500;

5) Enter an order requiring MicroStrategy to pay to OpenRisk punitive damages pursuant to Va. Code § 59.1-338(B);

6) Enter an order requiring MicroStrategy to pay OpenRisk's attorneys' fees pursuant to Va. Code § 59.1 – 338.1;

7) Enter an order requiring MicroStrategy to pay to OpenRisk compensatory, incidental and punitive damages for MicroStrategy's civil conspiracy;

8) Enter an order requiring MicroStrategy to pay to OpenRisk the appropriate pre- and/or post- judgment interest on any award;

9) Enter an order requiring MicroStrategy to pay to OpenRisk its costs for bringing these claims;

10) Grant such injunctive and other relief as the Court may deem just and proper.

## JURY DEMAND

OpenRisk hereby demands trial of these claims by jury.

Date: November 4, 2015                              Respectfully submitted,

                                                    Patricia E. Bruce, VSB No. 48007
                                                    R. Scott Caulkins, Esq., VSB No. 23584
                                                    CAULKINS & BRUCE, PC
                                                    2300 Wilson Blvd., Suite 240
                                                    Arlington, VA 22201
                                                    Telephone: (703) 558-3664
                                                    Facsimile: (703) 525-1331
                                                    scaulkins@caulkinsbruce.com

                                                    *Pro Hac Vice to be filed:*

                                                    Frank J. Gleason, MA Bar No. 632143
                                                    Jo Ann Jorge, MA Bar No. 632142
                                                    Gleason & Gleason
                                                    245 Winter Street
                                                    Ashland, MA 01721
                                                    Telephone: (508) 881-2955
                                                    Facsimile: (508) 881-4904
                                                    fgleason@gleasonlawfirm.net
                                                    jjorge@gleasonlawfirm.net

                                                    *Counsel for OpenRisk, LLC*